**Thomas F. DORAN, Ethel M. Doran, Oney S. Riggs, Dorothy F. Riggs, Ida Bee MacDonald, Clara Nieman, Gus H. Nieman, and John W. MacDonald, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 15250.**

United States Court of Appeals Ninth Circuit.

July 9, 1957.

Paine, Lowe, Coffin & Herman, Alan P. O'Kelly and R. E. Lowe, Spokane, Wash., for petitioners.

Charles K. Rice, Asst. Atty. Gen., and Carolyn R. Just, John N. Stull, and S. Dee Hanson, Attorneys, Dept. of Justice, Washington, D. C., for respondent.

Before LEMMON, FEE, and HAMLEY, Circuit Judges.

HAMLEY, Circuit Judge.

The named petitioners seek reversal of eight decisions rendered by the Tax Court of the United States, in consolidated proceedings to redetermine tax deficiencies.

The question we must decide is this: Where, under the circumstances of this case, life insurance policies on the lives of corporate stockholders were issued to trustees, the premiums being paid by the corporation, and where the trustees received the proceeds of one policy and purchased stock belonging to the deceased for the surviving stockholders, did the surviving stockholders realize taxable income in the form of a corporate distribution of earnings or profit?

The material facts have been stipulated. For some time prior to 1943, and until the tax year 1947, petitioners were stockholders of Inland Motor Freight, a Washington corporation.[1] They were all actively engaged in the operation and management of Inland, and were members of its board of directors. Prior to July, 1943, there had been informal dis-

---

1. The petitioners having the same surname are husband and wife. In this opinion, the term "petitioners" is used in most cases to denote the male members of the respective communities.

cussions among the stockholders of Inland with respect to an arrangement whereby funds could be accumulated so that in the event of the death of a stockholder the survivors would be able to purchase the decedent's stock.

At a special meeting of the stockholders held on July 3, 1943, a plan was unanimously adopted under which the company would purchase and pay for insurance on the lives of six stockholders in specified amounts. Under this plan, which was to be implemented by a contract between the stockholders, the proceeds of any such policy would be paid to the company and disbursed by it to all stockholders as a special dividend. This special dividend, in turn, was to be used by the stockholders to apply on the purchase of the corporate stock of the deceased insured stockholder.

On July 14, 1943, application was made by Inland to The Sun Life Assurance Company of Canada, for the issuance of a policy in the sum of fifty thousand dollars upon the life of Grover C. Ealy, president of the company. In this application, it was requested that the policy should be, by its terms, payable upon death to the estate of Grover C. Ealy. Similar applications were made for life insurance policies on the lives of the other officers and directors of the company.

The insurance company declined to issue the policies in this form, but did issue policies providing that the proceeds should be payable to Inland. These policies were tendered to Inland, but the officers of that company refused to accept them in this form.

In the meantime, a form of agreement between stockholders, dated July 10, 1943, but not executed at that time, had been prepared. This form of agreement, which makes reference to the stockholders' meeting of July 3, 1943, provided for the appointment of the president, vice president, and treasurer of Inland as trustees. It was to be their function to apply for and obtain insurance policies, in specified amounts, upon the lives of named stockholders. The trustees were

to be named as beneficiaries in each such policy. Upon the death of any insured, the proceeds of the policy on his life were to be paid to and disbursed by the trustees.

The disbursements under the July 10 form of agreement were to be made to the participating stockholders on a pro rata basis, according to the common-stock holdings of each participating stockholder at that time. It was provided that the proceeds, as so distributed, might be used by the receiving stockholders to purchase the common stock of the deceased stockholder. Each of the participating stockholders bound his estate, in the event of his death, to offer to sell his stock in Inland to the remaining stockholders at its then fair value.

On October 25, 1943, a special meeting of the directors was held, at which the July 10 form of agreement between stockholders, still unexecuted, was given consideration. A motion was unanimously adopted at this meeting, to the effect that it would be for the best interest of the company for the stockholders to enter into the July 10 form of contract, and for the company to purchase the insurance. This form of stockholders' agreement was signed by all but one of the stockholders and his wife, and became effective in November, 1943.

In December, 1943, the trustees named in this agreement applied to The Sun Life Assurance Company of Canada for a fifty-thousand-dollar life insurance policy on the life of Grover C. Ealy. In this application, it was stated that Grover C. Ealy was president and general manager of the "applicant." The application also recites that the interest which the beneficiary has in the life to be insured is that of "employer," and that the premiums on the policy would be paid by the "applicant."

Ealy died March 19, 1947. The trustees, including Ealy's successor, then received the proceeds of the policy on his life, in the amount of $50,785.30. Negotiations between the executor of Ealy's estate and the surviving signatories to

the July 10 agreement led to the sale of Ealy's stock to the trustees for $143,820.

The trustees made a down payment of fifty thousand dollars on this purchase by endorsing over the check which had been received from the insurance company. The stock was deposited in escrow pending payment of the balance of the purchase price. The surviving signatories of the agreement of July 10 were to receive the benefits of this contract, and hence are to be considered as pro rata recipients of the fifty-thousand-dollar down payment made from the proceeds of the policy on Ealy's life.

The premiums on the Ealy policy were paid by Inland and charged to surplus. In making income tax returns, the company did not at any time deduct or claim deduction for the payment of these premiums. These premiums were not charged to Ealy on the books of the company. At no time were such premiums, paid by the company, reported in the tax returns of the petitioners as income. Dividends on the policy were used to decrease premiums. Inland did not carry the policy on its books as an asset, either as to accrued dividends or cash surrender value.

The tax court concluded from these facts that, in applying for the insurance and in receiving and disbursing the proceeds thereof, the trustees were acting for and in behalf of Inland. They were its agents for those purposes, the tax court held, and did not represent the stockholders as individuals. In view of this conclusion, the tax court held that Inland received the proceeds of the Ealy policy. While these proceeds, according to the tax court, were not income in the hands of the corporation, because they came from life insurance,[2] they did represent income to the petitioners when distributed to them through the purchase of stock for their benefit. Accordingly, the tax court ruled, the commissioner correctly increased the taxable income of each petitioner by an amount which represents his proportion of the amount expended by the trustees for the purchase of Ealy's stock.

It cannot be doubted that, under the first plan which the officers and stockholders of the corporation conceived, the company would have become the owner and beneficiary of the insurance policies. This plan, evidenced by formal action taken at the stockholders' meeting of July 3, 1943, contemplated that the company would disburse the proceeds of any such policy to the surviving stockholders as a special dividend. Had this plan been effectuated, it is clear that the proceeds, when so disbursed, would have been taxable income in the hands of the stockholders receiving them.

But no such plan was carried into effect. The initial insurance application made by the company on July 14, 1943, did not conform to this plan, because it proposed that the estates of the insured stockholders, rather than the corporation, be the beneficiaries of the respective policies. When the insurance company declined to issue policies in this form, and tendered policies which would have conformed to the July 3 plan, they were rejected by the officers of the company.

The plan finally adopted differed in substantial respects from the July 3 plan. Instead of the corporation becoming the express owner and beneficiary of the policies, three named trustees, officers of the corporation, assumed this role. Instead of the corporation receiving the proceeds of these policies and disbursing them to the stockholders as special dividends, the trustees were to apply the proceeds on the purchase price of the stock of deceased stockholders, for the benefit of the surviving stockholders.

It is true, as respondent points out, that a trustee arrangement involving insurance on the lives of stockholders may be in such form that the corporation is to be regarded as the real owner of the policy. Thus, in Golden v. Commissioner, 3 Cir., 113 F.2d 590, the cor-

---

2. On the authority of United States v. Supplee-Biddle Hardware Co., 265 U.S. 189, 44 S.Ct. 546, 68 L.Ed. 970.

poration, after becoming the owner and beneficiary of a policy upon which it paid premiums, assigned all of its interest in the policy to a trustee to pay the proceeds to certain stockholders. This assignment was made pursuant to an agreement with the insured officer and a trust company. When it assigned the policies to the trustees, the corporation retained certain incidents of ownership which prevented title to the policies from vesting in the trustee. The court held that, under these circumstances, the disbursements of insurance proceeds by the trustees to the stockholders represented a corporate distribution, taxable as income, to the stockholders.

The case before us is to be distinguished from Golden, because here the corporation was not the initial named owner of the policies, never assigned an interest therein to the trustees, and accordingly could not have retained any incidents of ownership.

Respondent contends that the agreement dated July 10, 1943, and executed in November of that year, is a corporate act. Two circumstances are relied upon as leading to this conclusion. One is that the agreement "relates" to the July 3 special meeting of the stockholders, where corporate business was transacted. The other is that, on October 25, 1943, a meeting of the board of directors of the corporation was called for the purpose "of considering and in fact authorizing" the July 10 agreement.

As before noted, however, the agreement of July 10 does not purport to follow the plan of July 3.[3] Nor did the motion adopted at the October 25 meeting of the board of directors purport to authorize the stockholders to act for the corporation in entering into the agreement of July 10.[4] The only reason that board approval of the contract was essential was that the contract contemplated that the corporation would pay the insurance premiums.

The agreement of July 10 makes no reference to the corporation as owner or beneficiary of the policies, though it did provide that the corporation would pay the premiums. Had it been intended that the corporation be the owner and beneficiary of the policies, there would have been no need for any of the trustee apparatus. In our view, the agreement under discussion was not a corporate act, but was the act of the stockholders and their respective wives, acting as individuals and to serve their own purposes.

In reaching this conclusion, we have not overlooked the fact that the application for the Ealy policy contained statements which would indicate that the corporation was the real applicant. In the light of what we regard as the more basic considerations discussed above, these statements reveal surprising confusion of thought but nothing more significant. It is likewise true that both the corporation and the stockholders treated the matter, taxwise, as if the corporation was the owner of the policies. On the other hand, the policies were not carried on the books of the corporation as an asset.

It is plain from the record, as petitioners concede, that the parties to this transaction did not have a clear concept of what they were trying to do and of the difference between the acts of a corporation as an entity and of the acts of the stockholders as individuals. Nevertheless, disregarding the abortive plan of July 3, and looking through form to substance concerning the transactions

---

3. The only reference to the July 3 plan in the July 10 agreement is this: "Whereas, pursuant to discussions had at a special meeting of the stockholders of Inland Motor Freight held July 3rd, 1943, at the office of the company in Spokane, Washington, at which meeting all common stockholders were present in person it is considered advisable and for the benefit of each common stockholder that life insurance be purchased * *."

4. The minutes of that board meeting read: " * * * It was upon motion duly made, seconded and carried unanimously agreed that it would be for the best interest of the company for said stockholders to enter into said contract and for the company to purchase said insurance."

which followed, we are convinced that the insurance policy in question was purchased by the trustees for and on behalf of the individual stockholders, and not the corporation.

It follows that petitioners were entitled to claim an exemption for the proceeds of this insurance policy, under § 22(b) (1) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 22(b) (1), and are not chargeable with a taxable dividend or distribution from the corporation.

The judgments are reversed.